RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 1/12/11
BY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| BILLY W. TAYLOR | CIVIL ACTION NO. 04-521-M |
| -vs- | JUDGE DRELL |
| WASHINGTON MUTUAL, INC. | MAGISTRATE JUDGE KIRK |

## RULING

Before the Court for decision is a suit for allegedly unpaid bonuses and severance pay brought by Plaintiff Billy W. Taylor ("Taylor") against the Federal Deposit Insurance Corporation ("FDIC"), receiver for his now bankrupt former employer, Washington Mutual Bank ("WaMu"). The parties have agreed to try the case on the briefs and have jointly submitted their stipulations (Docs. 153, 157), exhibits (listed Doc. 156), and objections. After careful review of all the submissions and evidence and for the reasons given below, we find for the PLAINTIFF on all claims.

## BACKGROUND

Taylor was the National Correspondent Business Director for North American Mortgage Company ("NAMCO"), a subsidiary of Dime Savings Bank ("Dime"). Taylor reported directly to the president of NAMCO, Judson Croom. (Doc. 157, #1[1]).

Taylor had a Compensation Agreement dated January 1, 2001. The Agreement provided Taylor with a two-part "annual compensation" that consisted first of a base salary of $135,849, and second of a bonus of "two percent (2%) of the Value Created [by Taylor's division], as reported in

---

[1] This document is the "Joint Stipulations of Fact" filed by the parties. References are by stipulation number ("#X") rather than page number.

the Division's 2001 Economic Profit and Loss Statement." (Doc. 157, #2-4). It further specified that "the Company reserves the right to unilaterally modify this Compensation Agreement upon sixty (60) days written notice," but that "no modification shall affect the Compensation earned, but unpaid, under this Compensation Agreement as of the effective date of the modification." (Exh. 3, p. 4).[2]

Taylor also had a Change in Control Agreement with Dime. This Agreement provided that if there were a change in control resulting in Taylor's termination, Taylor would receive "a lump sum equal to [his] Annual Compensation." (Exh. 2, Sec. 3(a)). The Agreement defined his "Annual Compensation" as:

> an amount equal to the sum of (i) [his] annual rate of salary at such time, plus (ii) 100% of the target bonus or other cash incentive that [he is] eligible to earn in such year pursuant to each plan or program . . . of NAMCO or the Bank in effect for such year that provides for bonuses or other cash incentives.

(Exh. 2, Sec. 3(b)). The Change in Control Agreement also specified that the amount Taylor was due would be "without regard to any decrease in the rate of [his] Annual Compensation made after the Change in Control." (Exh. 2, Sec. 3(a)). Finally, it read that it is "intended to be binding upon NAMCO, its successors in interest, and assigns." (Exh. 2, Sec. 9).

In 2001, due to the mass refinancing of loans precipitated by lower interest rates and the beginning of the recent real estate bubble, Taylor earned bonuses totaling almost $1.4 million. (Doc. 157, #6).

Effective January 4, 2002, WaMu acquired Dime and assumed all of the assets and liabilities

---

[2] The parties graciously agreed to and submitted a joint Benchbook of exhibits. These exhibits are referenced by their exhibit number and page number, unless otherwise noted. Taylor's employment Agreements have their own numbering system which we use, as here, in referencing those documents. The parties also submitted various evidentiary objections, which we acknowledge were preserved and not waived by this joint submission.

of NAMCO. Taylor thus became an employee of WaMu, and WaMu assumed his Compensation and Change in Control Agreements. (Doc. 157, #8-9). In anticipation of the imminent acquisition, NAMCO had not established a formal budget for Taylor's division for the coming year, 2002. (Doc. 157, #7).

On January 17, 2002, WaMu notified Taylor that it would be changing the formula for calculating his bonus, allegedly replacing the 2% value add formula under which Taylor had earned $1.4 million the previous year with one yielding a significantly smaller bonus. WaMu made the change effective February 1, 2002, only about two weeks later, while Taylor's Compensation Agreement required sixty (60) days notice for any modification (Doc. 157, #10). Taylor has here challenged the validity of this modification and the adequacy of the bonuses he received under it.

In any case, the new formula was only in effect for a short time, for on March 11, 2002, WaMu terminated Taylor's employment, effective May 15, 2002.

Upon termination, Taylor was entitled to the pay, including bonuses, that he had and would earn prior to his effective date of termination. Also, under his Change in Control Agreement, he was entitled to a lump sum severance payment "equal to [his] Annual Compensation." (Doc. 157, #13; Exh. 2, Sec. 3(a)). As discussed, Taylor's "Annual Compensation" had two components, (i) his annual salary and (ii) "100% of the target bonus or other cash incentive that [he was] eligible to earn" that year. (Exh. 2, Sec. 3(b)).

Initially, WaMu paid Taylor $560,409 in severance, (Doc. 157, #19), an amount consisting of $135,849 in salary and $424,560 in bonus. (Exh. 36, p. 2). The annual salary portion was accurate and is here uncontested. However, Taylor contends that the "bonus or other cash incentive" component was insufficient and should have been almost $1.7 million, more than three times as

much as WaMu actually paid him.[3]

Before bringing the present proceeding, Taylor raised his claim for additional severance before an Umbrella Trust Committee ("the Committee"). This Committee was created by Dime pursuant to the Employee Retirement Income Security Act ("ERISA") to fund a number of "Covered Arrangements" it had with its senior executives, including Taylor's Change in Control Agreement. (Exh. 1, p. 2). The Trust was and is a "grantor trust" which allows WaMu, as Dime's successor, to recognize as its own income any proceeds generated by the Trust or leftover after all Trust payments are made. (Exh. 1, p. 2).

In a letter dated June 11, 2002, the Committee informed Taylor of its decision to affirm WaMu's calculation and deny his appeal. (Exh. 28). It stated its reasoning as follows:

> The Umbrella Trust Committee has been informed by representatives of Washington Mutual, Inc., that, while your bonus was paid based upon an objective formula, your annualized target bonus amount for the year 2002, as set by Washington Mutual, totaled $424,560. That amount therefore governs the amount of severance you are to receive based upon bonus, unless a higher level of target bonus was in effect immediately prior to the change in control . . . [thereafter, it explained its finding that, as NAMCO had set no budget for Taylor's division for 2002 prior to being acquired, and its pre-housing boom budget for 2001 projected he would earn a lesser amount than that set by WaMu no such "higher level of target bonus was in effect" at the time of the Change in Control, and the amount set by WaMu would apply]

(Exh. 28, p. 2). This decision is the main topic of contention here.

In April 2003 Taylor received and negotiated a check for his severance in the amount of WaMu's calculation. (Doc. 157, #19). In February 2004 he filed the present action seeking, among other relief, (I) additional pre-termination compensation under his Compensation Agreement, (II)

---

[3] Taylor reaches that amount by annualizing the ~$635,000 he earned in bonus for the 4+ months of 2002 that he worked prior to his termination. The $635,000 is the sum of the bonus Taylor was initially paid for that period, $566,993, plus the over $68,000 the parties have since agreed in settlement that he was due and not paid. (Doc. 157, #14); (Doc. 161, pp. 11, 17).

4

additional post-termination severance under his Change in Control Agreement, and (III and IV) attorney's fees, interest, and costs under various statutory provisions. (Doc. 1, pp. 4-5). He also filed a closely related action,[4] which we previously consolidated with this case and is finally resolved with our decision here.

We ruled in 2005 that Taylor's Change in Control Agreement constituted an ERISA plan under 29 U.S.C. § 1132(a)(1)(b), and therefore that his claim for additional severance would be governed by that statute. (Docs. 40, 104).

On September 25, 2008 WaMu was closed by the Office of Thrift Supervision and the FDIC was named its receiver. (Doc. 157, #22).

## ANALYSIS

**I. ADDITIONAL PRE-TERMINATION COMPENSATION CLAIM**

The parties litigated Taylor's claim for additional pre-termination compensation earlier in this case. In 2007 this Court granted Summary Judgment to Taylor on this issue as to liability, though not damages. Specifically, we ruled that WaMu's modification of his bonus formula was invalid, and that Taylor "was paid less under the new bonus calculation" than under the 2% value add formula it replaced, but we declined to specify an exact difference (Doc. 104, p. 9).

The parties have since agreed to settle the damages issue, accepting "plaintiff's claim for additional bonus under his employment contract in the amount of $68,085.30, plus pre-judgment interest of $22,656.13, plus costs now accrued." (Doc. 155). They have jointly submitted that agreement here (Doc. 155-1) and request that we incorporate it into the present judgment. We find this procedure appropriate, adopt it here, and otherwise consider this claim resolved.

---

[4] 05-cv-865.

5

## II. ADDITIONAL POST-TERMINATION SEVERANCE CLAIM

The main issue of dispute before us is Taylor's claim that he was paid insufficient severance, and that the Committee's affirmation of WaMu's severance calculation should be overruled. We discuss the Committee's decision in detail below, but to understand our ruling it is useful to first review WaMu's conduct in plain terms.

The purpose of a Change in Control Agreement is to preserve an employee's rights under an existing compensation agreement, to prevent another company from buying the employee's firm and depriving him of money he was owed and / or scheduled to earn. Taylor had already earned over $500,000 in bonuses the first few months of 2002 and was on pace to earn almost $1.7 million in bonus compensation for the year. WaMu fired him and paid him a severance that calculated his bonus at less than $425,000 for the entire year, a "target bonus" that it had unilaterally set for him.

This is exactly the type of conduct a Change in Control is designed to prevent. We explain in detail below why it runs counter to the specific terms of Taylor's Agreements, and our untangling of the Committee's strained reasoning goes on at some length. This length should not be read to indicate that our decision was difficult. It was not. WaMu's conduct plainly did violence to the terms of Taylor's Agreements, and the Committee's decision affirming it was self-evidently arbitrary and capricious. For the FDIC to continue to argue otherwise is almost frivolous.

### A. The Standard of Review is Irrelevant

The decision of an ERISA plan administrator vested with discretion to interpret the terms of a plan are generally reviewed for abuse of discretion. See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

However, the parties agree and we have previously ruled that the plan at issue is a "top hat"

plan, one which is (i) limited to highly paid executives, (ii) unfunded and paid out of the general assets of a company. Such plans are exempt from ERISA's fiduciary provisions, as well as some of its participation, vesting, and funding requirements. (Doc. 160, p. 13; Doc. 161, p. 8); See *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 512-13 (E.D. La. 2002).

Taylor argues that because these exemptions deprive these plans of many of their trust-like features, and these features, in accordance with the principles of the law of trusts, underlie the deference ordinarily accorded to plan administrators, the decision of a "top hat" plan administrator should not be entitled to deference and instead should be reviewed *de novo*. Taylor also provides various factual reasons that he claims the Committee's decision "is entitled to little or no deference", mostly based around its alleged conflict of interest and lack of independence. (Doc. 161, pp. 14-15).

Regarding Taylor's request for *de novo* review due to the plan's "top hat" status, there is some authority for his position, though the Fifth Circuit has thus far declined to resolve the issue. See *Acosta v. Bank of Louisiana*, 2003 WL 24176353 (E.D. La. 2003) (applying *de novo* standard based on the lack of usual trust law protections), *aff'd on other grounds* 88 Fed.Appx. 688 (5th Cir. 2004); *Goldstein v. Johnson & Johnson*, 251 F.3d. 433 (3rd Cir. 2001) (applying *de novo* standard); *Holloman v. Mail-Well Corp.*, 443 F.3d 832 (11th Cir. 2006) (affirming district court decision employing *de novo* standard without reaching the issue); but see *Fuqua v. Tarmac of America, Inc.*, 228 F.Supp.2d 755, 759-60 (E.D. Va. 2002) (rejecting argument for *de novo* standard, though applying the abuse of discretion standard with a "lessening of deference.").

In addition, the facts Taylor alleges about the Committee's mode of operation and apparent lack of independence are, at a minimum, troubling. If true, they could call into question the legitimacy of the Committee's decision and warrant a lessening of the deference owed to it,

7

regardless of the standard of review. See *Firestone*. 489 U.S. at 115 ("Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.") (citing Restatement [Second] of Trusts § 187, Cmt. D [1959]) (internal quotations omitted); *Metropolitcan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (holding that when "the entity that administers the plan, such as an employer or insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket . . . this dual role creates a conflict of interest[] that a reviewing court should consider . . . as a factor in determining whether the plan administrator has abused its discretion in denying benefits."); *Fuqua*, 228 F.Supp.2d at 759-60.

Here, we find that we need not decide either of these issues. Instead, as discussed below, we find that the Committee's decision was arbitrary and capricious and an abuse of discretion and thus should be overturned regardless of the standard of review or the Committee's mode of operation.

**B. The Abuse of Discretion Standard**

In the Fifth Circuit, a court typically employs a two-step process to determine whether an ERISA plan administrator abused its discretion in denying benefits. *E.g., Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246, fn. 2 (5th Cir. 2009) (citing *Stone v. Unocal Termination Allowance Plan*, 570 F.3d 252, 267 [5th Cir. 2009]). First, the court determines whether the plan administrator's decision was "legally correct." Second, if the decision is found to have been legally incorrect, then the court must decide whether its interpretation was an abuse of discretion. *Id.*

"We reach a finding of abuse of discretion only where the plan administrator acted arbitrarily or capriciously." *Holland*, 576 F.3d at 246 (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 [5th Cir. 1999]). "A decision is arbitrary only if made without a rational

8

connection between the known facts and the decision or between the found facts and the evidence." *Id.* An administrator's decision need only "fall somewhere on a continuum of reasonableness–even if on the low end" to be affirmed. *Id.* (citing *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 [5th Cir. 2007]).

**C, The Committee's determination was legally incorrect and an abuse of discretion**

*1. The decision is legally incorrect according to the plain language of Taylor's Agreements and the facts known to the Committee at the time of its decision*

As discussed, upon termination Taylor was entitled to a lump sum severance payment equal to his "Annual Compensation", an amount equal to his annual salary plus:

> 100% of the target bonus or other cash incentive that [he was] eligible to earn in such year pursuant to each plan or program (whether or not such plan or program has been formalized or is in written form) of NAMCO or the Bank in effect for such year that provides for bonuses or other cash incentives . . . without regard to any decrease in the rate of [his] Annual Compensation made after the Change in Control

(Exh. 2, #3(b)). Meanwhile, his Annual Compensation Agreement provided that, prior to the Change in Control, he was eligible to earn a bonus or cash incentive of "2% of the Value Created" by his division, as reported in its profit and loss statement for the year.

Taylor had earned almost $1.4 million under this plan the previous year, and he had already earned over $600,000 under it in 2002 prior to his termination. Yet, the Committee determined that Taylor was only "eligible to earn" about $425,000 in bonus that year, a decision the FDIC argues to be a "fair reading" of the above provisions, as likely to be "understood by the average plan participant." (Doc. 160, p. 28) (citing *Walker v. Wal-Mart Stores, Inc.*, 159 F.3d 938, 940-41 [5th Cir. 1998]). We disagree.

The amount provided by the Committee was the "target bonus" set by WaMu for Taylor after

9

the change in control occurred. The Change in Control Agreement forbids using such an amount if it is a "decrease in the rate of [Taylor's] Annual Compensation." However, the Committee found that Taylor was "eligible to earn" less under the Compensation Agreement in effect prior to the change in control than under the target bonus set for him by WaMu, and thus the "higher" WaMu amount should apply.

In reaching this conclusion that Taylor was "eligible to earn" over a year an amount drastically less than he had already earned in a few months, the Committee committed its key errors. Specifically, the Committee observed that neither NAMCO nor Dime had set a budget for Taylor's division for 2002 prior to being acquired in January of that year. It thus determined that the "target bonus" in effect for Taylor at the time of the change in control was the amount he would have earned under NAMCO's budgeted projections for his division for 2001. NAMCO had made these projections in 2000 prior to the beginning of the recent real estate boom, so Taylor was only expected to earn about $325,000, less than a fourth of what he actually earned that year, and less than WaMu's "target bonus" for him in 2002.

The errors in this reasoning are self-evident. First, as the FDIC explains, the Committee equated the incentive Taylor was "'eligible to earn' with a budgeted incentive amount," arguing that "a budgeted incentive amount is analogous to a 'target bonus.'" This is false. Taylor was eligible and entitled to earn the compensation provided in his contract, which made no reference to the company's budgeting or expectations for his division but specifically based his bonus on his division's actual, "reported" performance. The reason for this is readily apparent. A "budgeted incentive amount" is a unilateral projection of a company, while an employment contract is the result of bargaining between a company and an employee, and a division's financial results are also

10

presumably at least in part the result of a senior employee's influence.

Here, Taylor had a Compensation Agreement, valid and still in effect at the time of the Change in Control, that determined how much "bonus or other cash incentive that [he was] eligible to earn." It entitled him to "2% of the Value Created" by his division, irrespective of NAMCO's budgeted projections, or whether it had a budget at all. The Committee's decision ignored Taylor's Compensation Agreement and substituted for its calculations the employer's own, obviously conflicted targets and projections. This rule is unreasonable on its face in that it vitiates the protections provided by any Compensation and / or Change in Control Agreement. It is particularly unreasonable in this context considering the specific wording of Taylor's Agreements. His bonus was "2% of the Value Created" by his division "as reported" in its annual results, not as budgeted. The amount budgeted for his division was therefore self-evidently irrelevant. Likewise, it provided that he was entitled to whatever "cash incentive [he was] eligible to earn" for that year "whether or not . . . [it had been] formalized or [was] in written form." The Committee's focus on budgeted projections and NAMCO's lack of a formal budget for 2002, therefore, is inconsistent with any fair reading of the plan and lacks a rational connection to the facts which were before it.

Second, although the Committee was charged with determining how much Taylor was "eligible to earn" for 2002, it based its calculations on the amount NAMCO had budgeted for his division for the year 2001. As discussed, the budget for 2001 was set in 2000, when the economy was in recession, interest rates were higher, and the real estate bubble had not yet commenced. Taylor's division and bonus in 2001 exceeded NAMCO's projections by a multiple of 4. Likewise, he had already earned more than that amount in only the first months of 2002. Therefore, even if the Committee had been correct to focus on "budgeted" as opposed to "reported" figures, it was

11

unreasonable and incorrect to base its calculations on such obviously irrelevant and outdated data. Put differently, even if the Committee was within its right to choose to distinguish between the amount Taylor was "eligible to earn" and the amount he had "actually earned," it was unreasonable to use calculations whereby the former would be dramatically less than the latter.

Finally, though not conclusive, it is worth noting that the phrase emphasized by the Committee and the FDIC, "budgeted incentive amount" is without legal significance in the context of Taylor's Agreements and a misstatement of the figure the Committee was charged with computing. The phrase refers to how much Taylor would have earned had his division performed according to NAMCO's expectations. However, no separate budget was ever actually made for Taylor's compensation, the budgeted figure is never referenced in any of Taylor's Agreements, and indeed the entire purpose of the bonus incentives was to incentivize him to exceed these expectations. The phrase is thus without meaning in the context of Taylor's employment Agreements, and to use it as a limit on how much Taylor was "eligible to earn" for 2002 is unreasonable and inappropriate.

In all, the Committee decided to use pre-2001 numbers to estimate how much Taylor was eligible to earn in 2002 and budgeted figures when his contract specifically called for reported figures, and Taylor had already exceeded the amount it calculated he was eligible to earn for the year in only the year's first few months. We find that these decisions were incorrect and unreasonable, and that there was no basis for them in the plan as written or the facts then before the Committee.

### 2. *Why the FDIC's and Committee's apparent confusion is misplaced*

If the Committee's errors are so self-evident, then why did it make them? Its - along with WaMu's and the FDIC's - confusion seems to stem from the fact that Taylor's compensation was

based on a percentage of his division's actual performance for the year, and thus the amount he was "eligible to earn" for the year could not be known with certainty at the time of his mid-year firing; indeed, as Defendant emphasizes, it was theoretically infinite. The Committee's quest to evade this obviously untenable conclusion and find a more concrete number apparently led it to abandon the calculations demanded by Taylor's Agreements and embrace the pre-real estate boom budgeted figures discussed above, despite their flaws.

We acknowledge the problem with this indefiniteness. However, a difficulty in making an estimate is not a reason to give up on a calculation altogether when a contract specifically demands it, particularly when the contract is between two sophisticated business entities and the event giving rise to the difficulty - in this case a mid-year firing - was imminently foreseeable and indeed specifically anticipated at the time the contract was signed.

As well, it was Taylor's employer who drafted the Agreements. Generally, uncertainty in a contract is resolved against the drafting party. Here, the Committee resolved the uncertainty overwhelmingly in favor of the drafter. Moreover, it did so not by making a reasonable attempt to estimate or find a replacement for the difficult to calculate figure, but by abandoning the calculation altogether and replacing it with an amount the drafter had set unilaterally, when it had no basis in the Agreements or other facts before it to do so. The issue of indefiniteness was thus real but not insurmountable, and the Committee's response to it was unreasonable and ultimately an abuse of its discretion.

### 3. *The decision is an abuse of discretion*

As indicated above, the Committee's error was not simply an incorrect interpretation about which reasonable minds can disagree. Rather, it was arbitrary, made "without a rational connection

13

between the known facts and the decision." *Holland*, 576 F.3d at 246. The amount Taylor was "eligible to earn" for the year he was terminated cannot be (i) based on "budgeted" figures that ignored the calculations called for in his employment Agreements; (ii) based on clearly outdated projections of what his employer thought he would earn the previous year; (iii) dramatically lower than the amount he had already actually earned for that year; and (iv) ultimately equivalent to the "target bonus" Taylor's employer unilaterally and perhaps arbitrarily set for him following the Change in Control when this amount decreased the compensation he was "eligible to earn" for the year. All of these interpretations were incorrect, unreasonable, and entirely without support in the plain language of the plan and / or the facts as the Committee knew them. To affirm the Committee's decision we would have to accept not just one but all of them. We decline to do so and instead find that its decision was arbitrary and capricious and a clear abuse of discretion. We therefore rule that it be overturned, and from our perspective the call is not a close one.

**D. The Severance to Which Taylor is Entitled**

  *1. An annualization of the bonus Taylor had already earned is most appropriate*

  As discussed, though the choices made by the Committee were outside the realm of reason, we recognize that the amount Taylor was "eligible to earn" for the year he was terminated is open to more than one reasonable interpretation. If the Committee had made a calculation based on any such interpretation, even as an alternative to its final decision, we would defer to it. Absent such guidance however and among the various reasonable options advocated by the parties, we find the annualization of what Taylor had already earned for the year prior to termination the most faithful and reasonable calculation.

  The performance of Taylor's division apparently did not vary dramatically by season. So,

there is no reason to think that this number overestimates or underestimates how his division would have performed for the year. Meanwhile, it uses the most up-to-date results of his division's performance. Therefore, we find it more accurate than the other main options of using the bonus he earned for the previous year, or over the previous twelve months. Likewise, it best represents Taylor's personal performance, in contrast to using the actual results of his division for the entire year, which would include results from when he was no longer in charge.[5] For these reasons, we find an annualization of what Taylor had already earned prior to termination to be the best calculation of what he was "eligible to earn" for the year.

### 2. *This amount ultimately entitles him to an award of $1,268,981*

Based on the bonus Taylor was paid plus the settlement agreed to by the parties, Taylor earned $635,078 for approximately 4.5 months of work in 2002 prior to his termination. Annualized, this rate would have yielded a bonus of $1,693,541 for the year.[6] This is an increase over the approximately $1.3 million he earned the previous year, but not an extraordinary one, and certainly not an unsurprising one given the steadily improving market conditions.

This annualized figure, minus the $424,560 in bonus he was already paid in severance, yields a judgment in favor of plaintiff for additional severance bonus due of $1,268,981.

---

[5] This latter option is also inadvisable given that we must make our calculation based on the evidence presented and available to the Committee, not based on hindsight. See *Vega v. Nat'l Life Ins. Servs, Inc.*, 188 F.3d 287, 299-300 (5th Cir. 1999).

[6] This and the following calculations were first presented by Taylor in his initial trial brief. (Doc. 161, pp. 17, 26). They were uncontested by the FDIC in either its initial brief or response, and have been independently verified by the Court to the best of its ability.

## III. CLAIM FOR ATTORNEY'S FEES UNDER ERISA

### A. Taylor is Entitled to Attorney's Fees

ERISA permits a federal court, in its discretion, to award reasonable attorney's fees and costs to a party who has achieved "some degree of success on the merits." 29 U.S.C. § 1132(g)(1); *Hardt v. Reliance Standard Life Ins. Co.*, 130 S.Ct. 2149, 2151 (2010) (internal quotations and citations omitted). To determine whether to award attorney's fees and costs under ERISA, a court should consider the following factors:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting the attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position.

*Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980). We address these five factors seriatim below, explaining why, though an award is not our custom, we find one warranted here.

(1) As said, we do not make specific findings with regard to the Committee's alleged conflicts of interest or motives. Whatever the reason for its decision however, it abdicated its responsibility to enforce the plan as written and is culpable for Taylor incurring significant legal expense and delay in recovering his rightful payment. More importantly, as discussed below, we find WaMu's and the FDIC's continued defense of such a self-evidently erroneous decision to be almost frivolous, if not outright bad faith. Thus, we find it appropriate that they, rather than Plaintiff, bear the expense of their stubbornness.

(2) The ability of Defendant to satisfy an additional attorney's fee award is in some doubt.

16

There appears to be more than sufficient funds remaining in the Trust to satisfy the judgment. However, the status of the Trust, including who is ultimately responsible for it, is the topic of ongoing litigation between the FDIC and MorganChase, an acquirer of some of WaMu's assets. We do not wish to interfere with this litigation; however, there is no indication that an award of attorney's fees here would do so. More importantly, there is no indication that the litigation by itself calls into question the ultimate ability of whoever is responsible to satisfy the award. Accordingly, we do not find that the uncertainty surrounding this factor mitigates against our determination.

(3) On the other hand, we find that such an award would have significant deterrent benefit. The FDIC points out that WaMu is now insolvent and so cannot be specifically deterred. This observation ignores both that WaMu's successors could face similar situations in the future, and the value of the general deterrent effect of an award vis-a-vis other employers. It is inexorably tempting for an administrator to simply accept a company's determination, and for a company to try to avoid paying even a rightful claim by delay and other tactics that discourage claimants and drive up their costs. Indeed, WaMu ultimately succeeded in preventing Taylor from obtaining his severance in the course of his lifetime, and it has forced him to incur expenses that might have caused a different plaintiff to abdicate or accept a settlement for an amount lower than he was owed. Accordingly, we find that an award of attorney's fees here would be worthwhile to deter administrators from acting arbitrarily in the future, and companies and others similarly situated from engaging in frivolous delay tactics in the future.

(4) There is no indication that Taylor is fighting on behalf of a larger group of beneficiaries, or to resolve any significant legal question regarding ERISA itself, aside from the simple principle that a clear agreement should be honored and a legitimate claim promptly paid.

(5) The relative merits of the parties' positions weighs heavily in favor of awarding attorney's fees. This decision too is not close; Taylor's interpretation of his agreement is self-evidently correct by any method of interpretation, and the FDIC's continued defense of the Committee's decision borders on the frivolous. It is thus appropriate that Defendant, rather than Taylor, should bear the burden of this litigation.

Based on these factors, we find that the present circumstances warrant an award of attorney's fees and rule accordingly in the accompanying judgment.

### B. The FDIC is Not Immune from an Attorney's Fees Award

The FDIC briefly claims that it could be immune from attorney's fees or other cost awards under the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which, it claims, first releases the FDIC as Receiver from any "penalties or fines" levied against an insolvent financial institution, and second requires that the assets of a failed bank be ratably distributed among the bank's creditors. 12 U.S.C. Sections 1821, 1825(b)(3).

For the reasons articulated by Taylor in his response brief, we find that these theories are creative but ultimately without merit. (Doc. 163, p. 27 *et seq*). The Fifth Circuit has ruled squarely that Section 1825 deals with taxation, not general penalties or fines, and in any case we are unconvinced that an attorney's fee award, when provided by statute, constitutes a "penalty" in the sense intended by that statute. See *FDIC v. McFarland*, 243 F.3d 876, 886 (5th Cir. 2001). Otherwise, prior Fifth Circuit precedent, the reality that the ongoing litigation over the Trust does not necessarily indicate its or the ultimately responsible party's insolvency, and the possibility that the litigation could yield a collateral fund to pay this and other such claims convinces us that the ratable distribution exemption should likewise not apply. See *FDIC v. Scott*, 125 F.3d 254, 260 (5th

Cir. 1997); (Doc. 163, p. 28) (discussing the ongoing litigation and possibility of a collateral fund).

## IV. CLAIM FOR ATTORNEY'S FEES UNDER LPW

Under Louisiana's Wage Payment Statute ("LWPS"), if an employee brings a "well-founded suit" for unpaid wages, an award of reasonable attorney's fees is mandatory. La. R.S. 23:632; *Schuyten v. Superior Systems, Inc.*, 952 So.2d 98, 102 (La. App. 1 Cir. 2006). A suit in which recovery of wages is granted is generally considered well-founded. *Schuyten*, 952 So.2d at 107.

This Court has already ruled that Taylor was not paid compensation he was owed during the time of his employment, and the parties have since settled the exact amount of the claim. We find that Taylor's claim for these bonus payments is well-founded, and that Defendant's arguments that this statute does not apply here are inapt.

The main case that Defendant cites to the contrary held that a one-time severance payment was not a "wage" because it was not paid at regular intervals. *Boudreaux v. Hamilton Medical Group*, 644 So.2d 619, 621 (La. 1994). We find this ruling inapplicable here, as Taylor seeks fees under this statute based on his regular, quarterly paid bonus, not his severance, and other courts since *Boudreaux* have found that similar regularly and even annually paid bonuses constitute "wages" under the statute. See e.g. *Williams v. Dolgencorp, Inc.*, 888 So.2d 260, 264 (La. App. 3 Cir. 2004). Defendant's other equitable defenses regarding Taylor's alleged failure to make demand and its own good faith are similarly unconvincing. See *Monroe Firefighters Assoc. v. City of Monroe*, 2009 WL 805132, at *7 (W.D. La. 2009). Finally, the FDIC's claim to immunity from these payments fails for the same reason as does its immunity from fees under ERISA, discussed in Part III.B, above.

## V. OPEN EVIDENTIARY ISSUES

Both parties raised evidentiary objections to various exhibits, mostly concerning the

19

Committee's mode of operation and its alleged lack of independence. As we made no findings on these points and did not rely on any of this evidence in rendering our decision, we deny these objections as moot.

## CONCLUSION

For the reasons articulated above, we rule FOR the PLAINTIFF on all claims. For his unpaid compensation claim, in accordance with the settlement reached between the parties, we find for the Plaintiff in the amount of $68,085.30 in additional bonus, plus pre-judgment interest of $22,656.13, plus costs accrued. For his additional severance claim, we find for the Plaintiff in the amount of $1,268,981 in additional severance, plus interest and costs.

We also rule for the Plaintiff on both attorney fee claims and request that counsel submit calculations, with supporting documentation consistent with the Fifth Circuit's lodestar requirement, so that an appropriate judgment may be issued. See *Louisiana Power & Light, Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995) (citing, e.g., *Hensley v. Eckerhart*, 461 U.S. 424, 433 [1983]; *Brantley v. Surles*, 804 F.2d 321, 325 [5th Cir. 1986]).

Finally, as stated, this decision also resolves Taylor's related case, 05-cv-0865. We previously consolidated it with the present action and now consider it closed.

SIGNED on this 12 day of January, 2011 at Alexandria, Louisiana.

DEE D. DRELL

UNITED STATES DISTRICT JUDGE